IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**VIVIAN CASTON**                                                                                           **PLAINTIFF**

**V.**                                                            **NO. 4:17-CV-11-DMB-JMV**

**BOLIVAR COUNTY, MISSISSIPPI;
GERALD WESLEY, SR.; and
GERALD WESLEY, JR.**                                                     **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Before the Court are the motion for summary judgment of Gerald Wesley, Jr. and Gerald Wesley, Sr., Doc. #56; and the motion for summary judgment of Bolivar County, Mississippi, Doc. #58.

**I
Standard of Review**

"Summary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal quotation marks omitted). In evaluating a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record

which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## II
## Factual Background

### A. Vivian Caston's Hire

Vivian Caston, a resident of Duncan, Mississippi, was hired as a receptionist and clerk at the Bolivar County Regional Correctional Facility in November 1999 by then Bolivar County Sheriff Mack Grimmett. Doc. #60-1 at 5, 7. As receptionist, she "serve[d] as a front line service representative for the Bolivar County Regional Correctional Facility and also the Bolivar County Sheriff's Department."[1] Doc. #60-3 at 1. Vivian[2] was aware that she was hired as an at-will employee who "may be terminated for any reason without cause or notice" at any time. Doc. #60-1 at 29, 62.

Kelvin Williams became Bolivar County Sheriff in 2012 and was re-elected to the position in 2016. Doc. #60-5 at 4. Before the start of each of Williams' terms, all Correctional Facility

---

[1] The Correctional Facility's offices are divided between the Corrections Department, where Vivian worked, and the Sheriff's Department. Doc. #60-1 at 43.

[2] To avoid confusion, the first names of certain persons will be used.

2

employees had to apply to retain their jobs. Doc. #60-1 at 29–31. Vivian reapplied for her job on January 9, 2012, and again on November 30, 2015. *Id.* at 31. Some employees were not rehired during these reapplication periods. *Id.* at 31–32. Though Williams fired "quite a few" of his employees in 2012 because they were at-will, Vivian was retained. Doc. #60-5 at 20, 22.

### B. The Wesleys

Shortly after Williams assumed office in 2012, Gerald Wesley, Jr. was appointed Chief Deputy of the Bolivar County Sheriff's Department. Doc. #60-7 at 4. Wesley Jr.'s wife, Veronica, is an investigator with the Cleveland Police Department. Doc. #60-8 at 4. Wesley Jr.'s father, Gerald Wesley, Sr., retired from the Bolivar County Sheriff's Department in December 2015. Doc. #60-6 at 4–5. Before his retirement, Wesley Sr. served as the Bolivar County Sheriff Department's chief investigator for four years. *Id.* at 5.

Wesley Jr. and Wesley Sr. did not supervise Vivian. Wesley Jr. and Wesley Sr. worked on the Sheriff's Department side of the Correctional Facility while Vivian worked on the Corrections Department side. Doc. #58-3 at 7; Doc. #60-7 at 20–21.

### C. Wesley Jr. and Kesha Caston

Kesha Caston is Vivian's adult daughter. Doc. #60-1 at 7. In 2011 or 2012, Wesley Jr. began an extramarital affair with Kesha.[3] Doc. #60-7 at 5; Doc. #60-10 at 7. When Kesha became pregnant with Wesley Jr.'s child, Wesley Jr. asked her to have an abortion and gave her $500 for the procedure.[4] Doc. #60-7 at 5–7.

Vivian learned of Kesha's pregnancy on Memorial Day weekend in 2013. Doc. #60-1 at

---

[3] According to Wesley Jr., his affair with Kesha began in 2011. Doc. #60-7 at 5. According to Kesha, her affair with Wesley Jr. began in 2012. Doc. #60-10 at 7.

[4] Kesha never agreed to have an abortion, and saved the money Wesley Jr. gave her for an abortion to buy things for the baby. Doc. #60-1 at 37; Doc. #6-10 at 12.

3

35.  Vivian first discussed the pregnancy with Wesley Jr. after Kesha approached her upset and crying about his "want[ing] her to have an abortion." *Id*. at 35–36.  Vivian confronted Wesley Jr. about the abortion matter in his office during work hours and told him that Kesha was not going to have an abortion "because of … the risk [to] the baby." *Id*. at 36.  Vivian also told Wesley Jr. that she was "not going to approve" of Kesha having an abortion and asked him to stop asking Kesha to have one.  *Id*. at 36–37.

Williams, though aware Kesha was pregnant with Wesley Jr.'s child,[5] does not recall discussing the pregnancy with Vivian, Wesley Jr., or Wesley Sr., and was not aware that Wesley Jr. asked Kesha to have an abortion.  Doc. #60-5 at 7, 10.  Vivian testified she never discussed with Williams Kesha's relationship with Wesley Jr., Kesha's pregnancy, or the prospect of Kesha having an abortion.  Doc. #60-1 at 37.

### D. Confrontation between Vivian and Wesley Sr.

During Kesha's pregnancy, Wesley Sr. confronted Vivian in the parking lot of the Correctional Facility where they then both worked.  Doc. #60-1 at 39.  According to Vivian, Wesley Sr. told her that Williams told Wesley Jr. that "[Wesley Jr.] was going to cause [Williams] to lose the election" because of Kesha's pregnancy; and she replied, "That doesn't have anything to do with the election. That doesn't have nothing to do with me." *Id*. at 40.  Vivian claims Wesley Sr. also told her that if Kesha carried the pregnancy to term and Veronica found out, Kesha could be harmed.  Doc. #30 at 3.[6]  Wesley Sr. does not recall having this conversation, and denies threatening to harm Kesha or telling Vivian that Williams stated Kesha's pregnancy could lose

---

[5] Williams does not recall how he found out that Kesha was pregnant with Wesley Jr.'s child.  Doc. #60-5 at 7.

[6] Vivian testified at deposition that everything in her First Amended Complaint was true and correct to the best of her knowledge.  Doc. #60-1 at 65–66; Doc. #61 at 5 & n.3.  Therefore, the First Amended Complaint, Doc. #30, is competent summary judgment evidence.  *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (factual assertions made under penalty of perjury constitute competent summary judgment evidence).

him the election.  Doc. #60-6 at 10.

### E.  Wesley Sr.'s Phone Call to Vivian

According to Vivian, while Kesha was pregnant, Wesley Sr. called Vivian's home and "threatened" her.  Doc. #60-1 at 37–38.  Wesley Sr. accused Kesha and her friend of text messaging Veronica, and threatened to "call the state" on them.  *Id*. at 38.  After Wesley Sr. threatened her, Vivian called Williams and said that she "was not going to do anything to embarrass him, because he's the sheriff of Bolivar County."  *Id*. at 38–39.  Vivian testified that when she relayed to Williams that Wesley Sr. threatened her and that she wanted him to stop, Williams replied that he told Wesley Sr. "to leave that alone" and that "it would work itself out."  *Id*. at 39.

Wesley Sr. denies ever calling Vivian or threatening to call the authorities on her.  Doc. #60-6 at 13.  Williams does not recall Vivian complaining that Wesley Sr. threatened her; however, Williams testified he "may have" told Wesley Sr. to "leave it alone … [t]o keep peace and keep it from the office … because I don't like the conflict, and I didn't want it at the office."  Doc. #60-5 at 10–12.  Williams phoned Kesha about allegations that she or her friends were sending harassing text messages to Veronica, telling Kesha that she and Veronica "needed to try and work things out …."[7]  Doc. #60-10 at 25.

### F.  Kesha's Son

Kesha gave birth to a son in December 2013.  Doc. #60-7 at 11.  Williams testified that Kesha's pregnancy and birth did not interfere with the operation of the Correctional Facility, stating, "I don't recall it getting that serious."  Doc. #60-5 at 13.

Kesha would bring her son to the Correctional Facility to visit Vivian at work.  Doc. #60-

---

[7] Kesha subsequently received anonymous texts and reported them to the Cleveland Police Department.  Doc. #60-10 at 25–26.

1 at 42. Vivian recounts that her grandson was four or five months old when Kesha brought him for his first visit, and that Kesha would bring him by the facility "[e]very now and then." *Id*.

Williams saw Kesha or Vivian bring Kesha's son to the Correctional Facility "maybe once," and never told Kesha or Vivian not to bring the child there. Doc. #60-5 at 7–8. Williams had no issue or problem with Vivian's grandson visiting the front of the Correctional Facility, testifying that "[b]abies come in all the time." *Id*. at 8.

### G. Various Confrontations

After the birth of their son, Kesha and Wesley Jr. argued about rumors that Wesley Jr. falsified his salary for child support purposes by submitting his father's lower salary. Doc. #60-10 at 19–20. They also argued about Wesley Jr.'s refusal to sign the birth certificate and provide Kesha with his insurance card for the child. *Id*. at 22–24, 36–37.

While embroiled in a dispute with Wesley Jr. about his refusal to sign their son's birth certificate, Kesha confronted Veronica on October 1, 2014, outside the Cleveland Police Department where Veronica worked. Doc. #60-12 at 1, 3. Kesha and Veronica argued over Wesley Jr.'s refusal to sign the birth certificate after DNA tests proved that he was the child's father. Doc. #60-10 at 41–42. Melvin Sparks, then an investigator at the Cleveland Police Department, prepared an incident report stating that an "irate" Kesha had "started a disturbance" with Veronica.[8] Doc. #60-12 at 3.

Sometime before January 2015, Kesha came to the Correctional Facility to confront

---

[8] Sparks did not believe the report was warranted. He testified, "I hadn't even planned to do any report or anything, because I didn't want no parts of that. But -- until she came to me, and the chief had come to me, and 'Yeah, you're going to do this report. We need this report.'" Doc. #60-13 at 11. Sparks believed that the chief abused police power by instructing Sparks to submit the report. *Id*. at 25–26. Sparks testified that, after the confrontation with Kesha, Veronica stated, "I'm going to get her ass fired. It's going to be her last time coming up here." *Id*. at 15–16. Veronica later phoned Kesha's employer to report the disturbance. Doc. #60-8 at 16–17.

6

Wesley Jr. over issues with his insurance card.[9]  Doc. #60-1 at 42–45.  Vivian testified that an upset Wesley Jr. called her into his office, where he and Kesha "had a little altercation about the [insurance] card."[10]  *Id*. at 44.  Vivian stated that she "wish[ed] they could get along … better." *Id*.  Wesley Jr. then began objecting to the baby visiting the facility because it "can catch a disease." *Id*. at 44–45.  After Vivian defended her grandson's visits,[11] she stated that she "was a taxpayer citizen" and Kesha "has the right … [to] come out and visit me."  *Id*. at 45.  Williams, overhearing the conversation, entered Wesley Jr.'s office while Vivian was talking and believed that she "had came over and started the conversation."  *Id*.  After informing Williams that Wesley Jr. had summoned her into his office, Vivian returned to her post.  *Id*. at 45–46.

### H. Vivian's Termination

In February 2016, Williams terminated Vivian from her position with Bolivar County. Doc. #60-1 at 9.  Williams called Vivian into his office and told her that "he no longer needed [her] service."  *Id.* at 12.  Vivian recounted that she was "devastated" and surprised because she knew she "hadn't done anything," and asked Williams and Warden Ora Starks,[12] who was also present, for an explanation.  *Id*. at 12.  While Starks "just sat there" and did not provide an explanation, Williams replied, "Ms. Caston, enjoyed working with you. You can do your expedition at the courthouse, and I wish you all the best."  *Id*.

Williams testified that he terminated Vivian because "her services were no longer needed"

---

[9] Wesley Jr., who recalled that the dispute was over Kesha trying to get him to sign away his parental rights, testified that Kesha brought papers pertaining to parental rights to his office.  Doc. #60-7 at 17.

[10] Wesley Jr. testified that Kesha came into his office and threw papers at him on two occasions.  Doc. #60-7 at 17–18, 21–22.

[11] Vivian testified that because inmates walk around the facility, facility employees are required to have TB tests. Doc. #60-1 at 47–48.  Vivian disputed that Wesley Jr. was concerned about his son being infected with TB: "No, not to my knowledge.  No, huh-uh.  Because his daughter had came out there.  She has visited several times or more at the facility.  And like I say, offenders are more on the sheriff's department side than the correctional side."  *Id*. at 48.

[12] Warden Starks was managing the Corrections Department when Vivian was terminated.  Doc. #60-1 at 11.

7

and she was an at-will employee. Doc. #60-5 at 4–5. Williams acknowledges that he did not terminate Vivian for poor job performance, insubordination, or cause.[13] *Id.* at 6–7; *see* Doc. #60-16 at 6. Williams does not know why he did not terminate Vivian at the beginning of his first term. Doc. #60-5 at 22. Besides Vivian, two other employees were terminated at the start of Williams' second term. *Id.* at 21–22.

Kesha sent a text message to Williams after Vivian's termination, which Vivian viewed the day she was dismissed. Doc. #60-1 at 52–53. Kesha also responded to Vivian's termination by posting on Facebook, "I guess the Wesleys figured since they couldn't get to me or my child they would go through my mama." Doc. #74-1.

Neither Vivian nor Kesha had heard Wesley Sr. or Wesley Jr. talk to Williams or Starks about firing Vivian. Doc. #60-1 at 62–63; Doc. #60-10 at 50–51. Furthermore, no one told Vivian or Kesha that they had heard Wesley Sr. or Wesley Jr. talk to Williams or Starks about firing Vivian. Doc. #60-1 at 63; Doc. #60-10 at 51.

## III
## Procedural Background

On January 26, 2017, Vivian filed a complaint in the United States District Court for the Northern District of Mississippi against Bolivar County, Wesley Jr., and Wesley Sr. Doc. #1. On June 2, 2017, with the Court's leave, Vivian filed a First Amended Complaint. Doc. #30. In her First Amended Complaint, Vivian brings First Amendment[14] and Fourteenth Amendment claims under 42 U.S.C. § 1983 against Bolivar County; and a state tort claim of malicious interference

---

[13] Vivian received at least two employee warning notices during her tenure with Bolivar County—one in 2001 for "report[ing] late for work without calling in," and one in 2003 for violating "policy by showing disrespect to Deputy Warden Elmo Sellers after a difference of opinion." Doc. #60-4 at 1, 6. Neither was cited as the reason for her termination.

[14] Vivian also brought a First Amendment free exercise claim against Bolivar County but abandoned it in her brief opposing summary judgment. Doc. #63 at 11 n.8. Summary judgment on this abandoned claim will be denied as moot.

with employment against the Wesleys. *Id*. at 1–2.

The Wesleys filed a motion for summary judgment on December 7, 2017. Doc. #56. Vivian responded in opposition on December 21, 2017. Doc. #60. The Wesleys, after being granted a requested extension, replied on January 11, 2018. Doc. #74.

Also on December 7, 2017, Bolivar County filed a motion for summary judgment, which includes a request for "attorneys' fees, costs and expenses" pursuant to Rule 11 of the Federal Rules of Civil Procedure and the Mississippi Litigation Accountability Act of 1988. Doc. #58 at 2. Vivian responded in opposition on December 21, 2017. Doc. #62. Bolivar County replied on December 28, 2017. Doc. #71.

## IV
## Analysis

### A. Tortious Interference Claims against the Wesleys

Mississippi law authorizes recovery for tortious interference with an at-will employment contract.[15] *Levens v. Campbell*, 733 So.2d 753, 760 (Miss. 1999). "An action for tortious interference with contract ordinarily lies when a party maliciously interferes with a valid and enforceable contract, causing one party not to perform and resulting in injury to the other contracting party." *Id*. The elements a plaintiff must show are:

> (1) the acts were intentional and willful; (2) that they were calculated to cause damages to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and (4) that actual loss occurred. It must also be proven that the contract would have been performed but for the alleged interference.

*Id*. at 760–61 (internal citations omitted). Willfulness and calculation do not require a showing that a defendant "had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite

---

[15] Under Mississippi law, "absent an employment contract expressly providing to the contrary, an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible." *Shaw v. Burchfield*, 481 So.2d 247, 254 (Miss. 1985).

9

intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract." *Par Indus., Inc. v. Target Container Co.*, 708 So.2d 44, 48 (Miss. 1998) (emphasis omitted) (quoting *Liston v. Home Ins. Co.*, 659 F.Supp. 276, 281 (S.D. Miss. 1986).[16]

The Wesleys argue there is no evidence to indicate that they "did anything that could be construed as tortious interference" or that Vivian "was dismissed from her job for any reason other than Sheriff Williams decided to terminate three … at-will employees upon being sworn into office for a second term." Doc. #57 at 6–7. Wesley Jr. also argues that Vivian's claim is barred because it "falls within the auspices of the Mississippi Torts Claims Act." *Id.* at 7.

Vivian counters that "[a] reasonable jury considering all the evidence could conclude that the reason Sheriff Williams terminated [her] was because of the animosity the Wesleys had against [her] and her daughter, and not for any legitimate business reason. This would constitute bad faith and malicious interference with employment." Doc. #61 at 15. In other words, Vivian argues that a reasonable jury could infer based on the circumstances that the Wesleys intentionally and willfully participated in workplace confrontations calculated to cause her termination. Vivian also argues that the Mississippi Torts Claims Act does not apply because she has alleged "malice based torts." *Id.* at 19.

Vivian has cited no authority, and this Court is aware of none, standing for the proposition that general displays of animus are acts which are certain or substantially certain to result in interference with contract. Workplace disagreements are a fact of life. To make displays of

---

[16] *Par Industries, Inc.* involved a claim of tortious interference with contract. In *Levens*, which was decided the year after *Par Industries, Inc.*, the Mississippi Supreme Court held that tortious interference with at-will employment is cognizable under the law of tortious interference with contract. 733 So.2d at 760–61.

animosity actionable would be to turn every workplace altercation, no matter how benign, into a litigable event, a result courts have sought to avoid in other employment litigation contexts. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (stating need "to ensure that Title VII does not become a general civility code") (internal quotation marks omitted).[17] Here, Vivian has pointed to no evidence which would support a finding that the Wesleys' acts were certain or substantially certain to result in interference with her employment. In the absence of such evidence, summary judgment on Vivian's malicious interference claim is warranted.

### B. First Amendment Claims against Bolivar County

A "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). On the other hand, the government's interests "in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

To establish a prima facie case for First Amendment retaliation, a public employee must show:

(1) He suffered an adverse employment action;

(2) He spoke as a citizen, rather than pursuant to his official job duties;

(3) He spoke on a matter of public concern;

(4) His interest in the speech outweighed the government's interest in the efficient provision of public services; and

(5) His speech precipitated the adverse employment action.

*Hardesty v. Cochran*, 621 F. App'x 771, 775–76 (5th Cir. 2015) (citing *Wilson v. Tregre*, 787 F.3d

---

[17] Of course, special circumstances may exist where such displays may be substantially certain to result in interference with a contract. For example, instigation of arguments may be substantially certain to result in interference where a company has a policy, either formal or informal, of disciplining employees who engage in arguments.

322, 325 (5th Cir. 2015)).[18]

Bolivar County contends that neither Vivian's statement on abortion nor her statement on family visitation at work implicate a public concern as they "involved only intensely private matters." Doc. #71 at 2; *see* Doc. #59 at 15, 17. Bolivar County asserts that Vivian's workplace statements to Wesley Jr. regarding Kesha having an abortion "had nothing to do with any political, social, or other community concern, but concern over her daughter's health." Doc. #71 at 2 (citing Doc. #60-10 at 36); *see* Doc. #59 at 17.[19] As for Vivian's statements regarding Kesha's visits to her work, Bolivar County submits that "[Vivian] cannot show how her daughter being able to visit her at the jail facility implicated a public concern. In fact, [Vivian] does not even attempt such an argument." Doc. #71 at 3 (internal quotation marks omitted).

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 134 S.Ct. 2369, 2380 (2014) (internal quotation marks omitted). However, speech is not a matter of concern "merely because it involves public employees" and "personal employment disputes are not, by themselves, matters of public concern." *Gibson v. Kilpatrick*, 838 F.3d 476, 485, 487 (5th Cir. 2016).

---

[18] The prima facie First Amendment retaliation case has traditionally been identified as a four-element test. *See Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004) ("[A] First Amendment retaliation claim in the employment context has four elements: (1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct."). The second element in the traditional test, "public concern," has always turned on the consideration of "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The five-element test employed here separately addresses the citizen-employee inquiry and public concern inquiry. In this regard, there is no difference between the four-element test and the five-element test.

[19] Bolivar County argues that Vivian's statements "were specific [to] her daughter's choices as a mother, the baby's health, and whether [her] daughter would carry her child to term, not about the concept of abortion in a political or social sense." Doc. #59 at 17.

The Court agrees with Bolivar County that Vivian's statements on abortion do not implicate a public concern. Although Vivian's speech may have occurred in the context of a dramatic dispute between public employees, the content of the disputes was confined to private, personal matters. Accordingly, Vivian is unable to meet her burden that her statements on abortion implicate a matter of public concern.

The Court also agrees with Bolivar County that Vivian's statements about family visitation at her workplace involved no public concern. Despite reference to her position as a "taxpayer citizen," Vivian's description of her statements is confined to a personal dispute of whether her daughter and grandchild could visit her at work. Vivian's claim that she spoke as a private citizen does not transform her speech into a matter of public concern. That she spoke as a private citizen is merely a "threshold layer" to recovery as "the First Amendment does not protect expressions made pursuant to [an employee's] official duties." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (internal quotation marks omitted).[20] Vivian's summary judgment evidence only demonstrates a disagreement with a colleague about whether her family could visit her at her workplace. *See Gibson*, 838 F.3d at 487 ("personal employment disputes are not, by themselves, matters of public concern").

Because Vivian has failed to present evidence that her speech on abortion or family visitation at the Correctional Facility is a matter of public concern, summary judgment will be granted on her First Amendment claim in that regard.[21]

---

[20] *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

[21] As mentioned above, to the extent Bolivar County seeks summary judgment on Vivian's abandoned First Amendment free exercise claim, summary judgment will be denied as moot.

### C. Fourteenth Amendment Claims against Bolivar County[22]

Vivian asserts that her rights to familial association were violated by Bolivar County because "[t]here is sufficient circumstantial evidence for a jury to find that the Defendant discharged Plaintiff because of her … asserting her rights to visit with her grandchild." Doc. #63 at 14. As a threshold matter, Bolivar County argues that Vivian has not sufficiently pleaded her familial association claim as it concerns abortion:

> It appears [Vivian] is now trying to couch her Fourteenth Amendment freedom of association claim in terms of her "advice concerning abortion" as well as "asserting her rights to visit with her grandchild." However, [Vivian] failed to plead any claim in her Complaint related to the abortion comments and a Fourteenth Amendment freedom of association claim. As such, Plaintiff cannot make any such claim now.

Doc. #71 at 5.

The Court agrees that any Fourteenth Amendment claim by Vivian pertaining to whether her daughter would have an abortion is not properly pleaded. Regarding her Fourteenth Amendment family association claim, Vivian states in the First Amended Complaint, "A further contributing cause was Plaintiff's exercise of her free speech rights and her Fourteenth Amendment fundamental family associative rights by not prohibiting her daughter from coming to the correctional facility, as all other citizens are allowed to do." Doc. #30 at 4. Accordingly, the Court will only consider Vivian's Fourteenth Amendment family association claim as it pertains to "her daughter … coming to the correctional facility." *Id.*

Bolivar County argues that Vivian's "Fourteenth Amendment claim of 'fundamental

---

[22] Despite Vivian's suggestion at certain points in her brief that her familial association claim arises under the First and Fourteenth Amendments, the Court declines to construe her familial association claim as arising under both. Family free association implicates only the Fourteenth—not the First—Amendment. *See Payne v. Fontenot*, 925 F.Supp. 414, 418 (M.D. La. 1995) ("Freedom of association … includes the freedom to choose one's spouse and to maintain a relationship with members of one's family. … [T]his type of private association is protected not by the First Amendment, but by the fundamental right of privacy emanating from the fourteenth amendment.") (footnotes omitted).

family associative rights' fails … as (1) she has not shown how her association rights were violated and alternatively, (2) she cannot show her termination from Bolivar County was the result of her daughter visiting her at work." Doc. #59 at 23. According to Bolivar County,

> [Vivian's] freedom of association claims fail … because she has no evidence her daughter was prohibited from visiting her at work by any policy maker of Bolivar County. [Vivian] has not alleged her daughter or granddaughter were prevented in any way from associating with her in the office. In fact, Sheriff Williams specifically testified he had no issue with [Vivan's] family visiting her.

*Id*. at 24. Bolivar County also argues that the claim fails "because [Vivian] has no evidence linking the policy maker – Sheriff Williams – and his decision to terminate [Vivian] to her daughter's visits at work which occurred, at best, more than a year before Vivian Caston's termination." *Id*. at 25.

Vivian cites no authority for a Fourteenth Amendment right to visits by family at work. Workplace visits by an adult daughter and a minor grandson do not implicate "the right of the family to remain together," which is fundamental to a Fourteenth Amendment familial association claim.[23] *See, e.g., Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 7–9 (1st Cir. 1986) ("precedent establishing constitutional protection for various aspects of family life falls short of establishing a liberty interest" in companionship of adult son).

Furthermore, Vivian points to no evidence that there was a policy or custom in place prohibiting family visits or that Sheriff Williams—the policymaker—was opposed to familial visits at the Correctional Facility. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978) ("[T]he touchstone of the § 1983 action against a government body is an allegation that official policy [or custom] is responsible for a deprivation of rights protected by the Constitution …."). Vivian offers evidence that she had an argument at work with Wesley Jr. regarding visits

---

[23] *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999).

15

by her daughter and grandson but no evidence of her family being banned from the facility.

Because Vivian asserts interests not protected by the Fourteenth Amendment and points to no policy that prevented her from asserting her putative interests, Bolivar County is entitled to summary judgment on her Fourteenth Amendment claims.

### D. Sanctions

In its motion for summary judgment, Bolivar County requests "attorneys' fees, costs and expenses associated with the defense of the instant civil action pursuant to Rule 11, Federal Rules of Civil Procedure and The Mississippi Litigation Accountability Act of 1988, and Miss. Code Ann. §11-1-54 (2003)." Doc. #58 at 2 (emphasis omitted).

Because Vivian asserts federal claims against Bolivar County not removed from state court, the proper authority for awarding attorney's fees in this case is Rule 11 of the Federal Rules of Civil Procedure—not any Mississippi state law rule or statute. *See Klein v. City of Laguna Beach*, 810 F.3d 693, 701–02 (9th Cir. 2016) ("[F]ederal courts apply state law for attorneys' fees to state claims because of the *Erie* doctrine and *Erie* does not compel federal courts to apply state law to a federal claim.") (citation and footnote omitted); *cf. Tompkins v. Cyr*, 202 F.3d 770, 787 (5th Cir. 2000) (state sanction rules may be applied by a federal court to pleadings filed in state court before removal).

Federal Rule of Civil Procedure 11(c) provides, in pertinent part, that a "motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Since Bolivar County has not filed a separate Rule 11 motion describing the specific conduct it alleges violates Rule 11, the Court declines to address Bolivar County's request for fees, costs, and expenses. *See In re Pratt*, 524 F.3d 580, 588 (5th Cir. 2008) ("we have continually held that strict compliance with Rule 11 is mandatory").

16

# V
# Conclusion

The Wesleys' motion for summary judgment [56] is **GRANTED**.

Bolivar County's motion for summary judgment [58] is **GRANTED in Part and DENIED in Part**. Bolivar County's motion is granted to extent it seeks summary judgment on Vivian's First Amendment retaliation and Fourteenth Amendment claims; is denied as moot to the extent it seeks summary judgment on Vivian's abandoned First Amendment free exercise claim; and is denied to the extent it seeks sanctions.

**SO ORDERED**, this 30th day of May, 2018.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**